**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| TALMAN CONSULTANTS, LLC, an Illinois Limited Liability Corporation, ) ) ) | |
| Plaintiff, ) ) ) | Civil Action No. |
| v. ) ) | |
| ALEXANDRA UREVIG, individually and HACKER CONSULTING GROUP, LLC, an Illinois Limited Liability Corporation, ) ) ) ) ) | JURY DEMANDED |
| Defendants. ) | |

**VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiff Talman Consultants, LLC ("Talman"), by and through its attorneys, Williams, Bax & Saltzman, P.C., for its Verified Complaint against Defendants Alexandra Urevig f/k/a Alexandra Shutske ("Urevig") and Hacker Consulting Group, LLC ("Hacker") states as follows:

**SUMMARY OF THE CLAIMS**

1. This is an action for injunctive relief and damages arising from Defendant Urevig's breach of her employment contract, and from the misappropriation of trade secrets and confidential information by Urevig and Hacker, which Defendants have used to unfairly compete with Talman and to poach customers from Talman's customer base.

2. Talman is an engineering consulting firm that works with general contractors to provide a continuous and efficient path from beginning to completion for public works projects in the infrastructure, telecommunication, and utilities markets. Talman provides a wide range of engineering consulting services that includes engineering design and review, regulatory compliance, project life cycle optimization, project management and permit acquisition.

Talman's customers include both national carriers, such as AT&T and Verizon, and local contractors.

3. Obtaining the requisite project permits is an essential part of every public works project and it is a key component of Talman's approach to project planning. Talman owners have developed, over many years, a unique best practices methodology and a network of key business relationships that allows Talman to significantly expedite the permit acquisition process, which helps its customers meet deadlines.

4. On or about January 3, 2018, Defendant Alexandra Urevig was hired by Talman as a Permit Coordinator. Because Urevig's job responsibilities required that she learn and utilize Talman's trade secrets and confidential information, Urevig was required to sign an employment agreement, which contained, *inter alia*, non-solicitation and confidentiality clauses.

5. While employed in Talman's permit department, Urevig was trained on and frequently utilized the unique methodology developed by Talman to streamline the process for acquiring the engineering permits required for public works. Uverig was also exposed to Talman's unique pricing formula as well as customer and vendor contacts, all which Talman regards and treats as confidential, proprietary information.

6. On or about June 6, 2022, Urevig submitted her voluntary resignation to Talman. Because Talman had invested a considerable amount of time, money and effort in training Urevig, Talman tried to convince Urevig not to resign. Urevig, however, insisted on quitting and claimed that she was resigning because she was overwhelmed by the work and because the competitive nature of the industry was "too much for her."

7. Before she left Urevig told other managers that she was going back to work in the health care industry and that she wouldn't think of competing with Talman because she was so appreciative of how much she was taught and how she was treated. Urevig's last day of employment was on June 24, 2022.

8. Contrary to her representations, however, by the time Urevig ended her employment at Talman, she had already sent to her personal email account Talman's trade secrets, including its confidential permit acquisition procedural manuals, a list of customer contacts and sample permit applications processed by Talman on behalf of its customers.

9. By Urevig's last day of employment at Talman, she had also already set up Hacker as a competing enterprise and developed plans to unfairly compete with Talman by using its proprietary, confidential information, by poaching from its customer base and by undercutting its pricing.

10. Talman recently learned that Urevig and Hacker have begun soliciting several of Talman's long-standing customers. Defendants have, on information and belief, successfully poached permit acquisition business from at least one of Talman's long-standing customers. Defendants are also currently actively soliciting business from other long-standing customers.

11. As a result, Talman's business faces a serious and substantial threat of irreparable harm by Defendants' unlawful conduct.

12. Talman therefore seeks by this Complaint to obtain injunctive relief to prevent Defendants from further engaging in unfair competition and to protect the value of Talman's trade secrets and confidential information, as well as the integrity of Talman's customer relationships.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over the claims under the federal Defend Trade Secrets Act, 18 U.S.C. § 1831, *et seq*. pursuant to 28 U.S.C. § 1331. This Court also has supplemental jurisdiction over all other claims alleged in the Complaint pursuant to 28 U.S.C. § 1367.

14. This Court also has subject matter jurisdiction based on diversity of citizenship pursuant to 28 U.S.C. § 1332 as Urevig is a resident of Indiana and is the sole member of Hacker, an Illinois Limited Liability Corporation. Talman is an Illinois Limited Liability Corporation, and its members are residents of Illinois. The amount in controversy also exceeds $75,000.00.

15. This Court has personal jurisdiction over Defendants Urevig and Hacker because they conduct business in the State of Illinois; Urevig's employment agreement was executed in the State of Illinois; and Urevig consented to Illinois jurisdiction in her employment agreement. Furthermore, Defendants' tortious acts, including the misappropriation of trade secrets and confidential information and the tortious interference with prospective economic advantages, all occurred in Illinois.

16. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims occurred in this judicial district.

## FACTUAL BACKGROUND

### A. *The Parties*

17. Talman is in the business of providing engineering consulting services in the infrastructure, telecommunication and utilities markets. Talman's consulting services include engineering design and review, regulatory compliance, project life cycle optimization, project management and permit acquisition.

18. Talman provides consulting services to national carriers, such as AT&T, ComEd, and Verizon, as well as to local contractors in various states throughout the country.

19. Talman's consulting services vary from project to project but usually involve providing guidance on public regulations and procedures connected with public works projects. An essential ingredient of Talman's consulting services is its ability to expedite the permitting process for its customers.

20. Talman's permit acquisition process was developed and refined by Talman's owners, Katherine Latham and James Norton, who utilized their combined knowledge and years of experience to develop a new, systematic approach to the permit acquisition process. The process that Latham and Norton developed capitalizes on both a detailed understanding of the separate procedures utilized by the various localities that issue the permits and the relationships that have been developed with key decision makers at each locality for over 20 years.

21. Talman's unique methodology is very valuable to its customers because the process facilitates the completion of projects on time. For this reason, among many others, Talman's permit acquisition process provides it with a significant competitive edge over other consultants in the same industries.

22. Defendant Urevig worked as a member of Talman's permit acquisition team during her employment at Talman from 2018 to 2022. Before coming to Talman, Urevig had no prior exposure to nor experience in the infrastructure, telecommunication and utilities industries and no knowledge about the permit acquisition process.

23. As a permit coordinator, Urevrig learned Talman's permit acquisition processes under the tutelage of Latham and Norton, who not only taught Urevig the processes that it had

taken them many years to develop, but also introduced her to many of the key decision makers involved in the local permit acquisition process.

24. Latham and Norton also introduced Urevig to its local general contractor customers, including Pirtano Construction Company, Electrical Conduit Construction, MelComm and numerous others. Talman has been doing business with each of these contractors for several years before Urevig was employed at Talman and Urevig would not have known or met any of these contractors but for her employment at Talman.

25. Talman codified its permit acquisition methodology into two internal manuals. One of the manuals pertains to the permit acquisition process in Chicago and Cook County. The second manual relates to permit acquisition in the suburbs and other counties surrounding Cook. Urevig participated in drafting the manual for Chicago and Cook County based on the information she learned from Latham and Norton.

26. Urevig did not participate in drafting the permit acquisition manual for the suburbs and counties surrounding Cook County because she had no experience working in those areas.

27. Urevig was also exposed to Talman's unique pricing formulas, which were also developed by Latham and Norton based on their knowledge and experience concerning the cost and amount of labor and skill required to obtain each of the myriad of types of permits that might be needed for a public work project. Talman's pricing structure is strictly confidential.

28. Talman regards the pricing formulas, permit acquisition processes (including the manuals) and the customer and vendor relationships that were developed by Latham and Norton as confidential and proprietary trade secrets ("Protected Information"). Talman therefore takes specific measures to preserve the confidentiality of its Protected Information, including:

a) requiring employees exposed to the information to sign agreements containing terms and covenants designed to maintain confidentiality;

b) restricting access to the Protected Information to only those employees who have a need to know the information to perform their jobs;

c) restricting access to computerized Protected Information through the use of passwords;

d) removing employee access to confidential information upon termination of employment;

e) promulgating multiple confidentiality rules and policies; and

f) prohibiting the unauthorized removal of company information and property and requiring the return of all information and property upon termination of employment. (See Exhibit A, Urevig Employment Agreement); (See Exhibit B, Talman Employee Handbook); (See Exhibit C, Talman Code of Ethics).

**B.** *Urevig's Employment Agreement.*

29. Urevig was hired and signed an Employment Agreement and Covenant Not to Solicit. (See Exhibit A). Urevig's employment agreement contains a non-solicitation clause prohibiting solicitation of customers and prospective customers. The provision states as follows:

> Employee agrees that, during the period beginning on the execution of this Agreement and ending twelve (12) months following Employee's voluntary or involuntary termination of employment, Employee shall not in any capacity, whether directly or indirectly, and regarding any location in the United States of America:
>
> Call on, solicit, service (or own, manage, operate or control, or be connected as an officer, director, employee, consultant, advisor, agent, independent contractor, representative, partner, member, of or with any person that calls on, solicits, or services) any individual, entity, or successor to any individual or entity which is or was a client or customer of Employer's at any time during the time Employee was engaged to perform any work for Employer, or who Employee had knowledge of prior to termination of employment was a prospective client of Employer. (See Exhibit A, ¶ 5(b)).

30. Urevig's employment agreement also contains a confidentiality provision. The provision states as follows:

> Employee will (and will cause each person and entity under his or her direct or indirect control (his or her "Affiliates") and his or her representatives to) treat and hold as confidential all of the Confidential Information (as that term is defined herein).
>
> Confidential information means information, whether oral, written, recorded, magnetically or electronically or otherwise stored and whether originated by Employee or otherwise coming into the possession or knowledge of Employee, which is possessed by or developed for the Employer and which relates to the Business of the Employer or potential Business of the Employer, which information is not reasonably ascertainable by the Employer's competitors or by the general public through lawful means, including but not limited to information regarding the Employer's products services, customer contracts, pricing formulae, vendors, suppliers, specifications, designs, processes, business affairs, business plans, strategies, finances, computer programs, research, customer development, planning, production plans, purchasing, finance, marketing, customer relations and customer information and other information received by the Employer from others which the Employer has an obligation to treat as confidential. (See Exhibit A, ¶ 5(b)).

31. In Paragraph 5 of her employment agreement, Urevig acknowledged and agreed that the restrictive covenants in her employment agreement were a material inducement to the execution of her employment agreement and that such restrictions were reasonable to protect Talman's legitimate business interests. Paragraph 5(e) states the following:

> Employee acknowledges and agrees that (i) his or her agreement to the covenants contained in this Section 5 are a material inducement to Employer's execution of this Agreement, (ii) the restrictions contained in this Section 5 are reasonable and narrowly drawn to impose no greater restraint than is necessary to protect the goodwill of the Employer and to protect Employer's legitimate interests, and (iii) supported by sufficient consideration in Section 1 set forth above. (See Exhibit A, ¶ 5(e)).

32. In paragraph 5(f) of her employment agreement, Urevig also agreed that Talman would be irreparably harmed if she breached the restrictive covenants contained in her employment agreement and Talman could enforce the restrictive covenants through the issuance of a temporary restraining order and preliminary injunction. Paragraph 5(f) states the following:

> If Employee, or any of his or her Affiliates breach or threaten to commit a breach of any of the restrictive covenants set forth in this Section 5, then Employer shall

have the right and remedy to have the restrictive covenants in this Section 5 specifically enforced against Employee, and his or her Affiliates, including through temporary restraining orders and injunctions by any court of competent jurisdiction, it being agreed by Employee that any breach or threatened breach by Employee or any of his Affiliates of this Section 5 would cause irreparable injury to the Employer and that money damages would not provide an adequate remedy to Buyer. (See Exhibit A, ¶ 5(f)).

33. Urevig's employment agreement also contains an attorney's fee provision. The provision states as follows:

In any action to enforce one's rights hereunder, the reasonable legal fees and expenses of the prevailing party shall be borne by the non-prevailing party. (See Exhibit A, ¶ 13).

C. *After Urevig Misappropriates Talman's Trade Secrets, She Resigns, Establishes a Competing Company and Begins to Solicit Talman's Customers.*

34. In May 2022, several weeks before Urevig submitted her resignation, she forwarded Talman's Protected Information to her personal email account. This information included the manuals that detailed Talman's permit acquisition processes for Chicago and surrounding communities. Urevig also emailed herself copies of Talman's customer lists and sample permits for the City of Chicago. (See Exhibit D, Urevig May 3, 2022 Email).

35. Hacker was incorporated in Illinois on June 23, 2022, which was prior to Urevig's last day of employment at Talman. (See Exhibit E, Illinois Secretary of State LLC File Detail Report).

36. When Urevig submitted her resignation in June, she lied about her plans. Urevig told Latham that Urevig was leaving the industry because the competitive and demanding nature of the business "was too much for her." Urevig also told Joe Simpson, Talman's Human Resources Manager, that she would never work for a competitor because she appreciated how much she learned and how well she was treated by Talman. Urevig also told another manager that Urevig was going back to work in the health care industry.

37. On information and belief, before she submitted her resignation, Urevig deliberately "slow played" permit acquisition work from at least one of Talman's customers so that the work would be available when Urevig left Talman and started Hacker.

### D. *Uverig Uses Pricing Information and Other Confidential Information to Compete Unfairly with Talman.*

38. On August 15, 2022, less than two months after Urevig ended her employment with Talman, Urevig emailed Craig Shiffman of MasTec Network Solutions, one of Talman's long-time customers that Urevig met while employed by Talman. Urevig's email advised Shiffman that Urevig had started her "own permitting firm specializing in permit acquisition throughout Chicago and the surrounding municipalities." (See Exhibit F, Urevig August 15, 2022 Email to Shiffman).

39. On October 17, 2022, Urevig emailed Kevin Wilhelm of Melcomm Services, another long-time customer of Talman that Urevig met while employed by Talman. The email informed Wilhelm that Urevig has "gone out on my own for permitting services." The email also contained an attachment that included the prices that Hacker was charging for its permitting services. Conspicuously, all the quoted prices are just slightly below what Talman had been charging while Urevig was working at Talman. (See Exhibit G, Urevig October 17, 2022 Email to Wilhelm).

40. Within the first few months after Urevig left, Talman noticed a substantial decrease in the amount of permit acquisition business it was getting from PirTano Construction Company one of Talman's largest permit acquisition clients.

41. On October 11, 2022, Talman received an email from PirTano Construction Company requesting all contractors on the referenced projects to submit outstanding invoices for payment. Urevig and Hacker are included on the email. On information and belief, Urevig used

Talman's confidential information, including its pricing information, to solicit business from PirTano. (See Exhibit H, PirTano October 11, 2022 Email to Talman).

## COUNT I
## BREACH OF CONTRACT (Non-Solicit and Confidentiality Clauses)

42. Talman incorporates by reference the allegation in paragraphs 1 through 41 of the Complaint as fully set forth herein.

43. The employment agreement and covenant not to solicit that Urevig signed is a valid and enforceable agreement.

44. Talman performed the duties and obligations it agreed to and owed Defendant Urevig under the agreement.

45. Under the agreement, Defendant Urevig was and is prohibited from taking or using Talman's Protected Information and from soliciting or providing services to a current or prospective customer of Talman.

46. In breach of the agreement, Urevig disclosed and utilized Talman's Protected Information to solicit Talman's customers.

47. Due to Defendant's breach, Talman has been damaged.

## COUNT II
## MISAPPROPRIATION OF TRADE SECRETS AND VIOLATION OF THE DEFEND TRADE SECRETS ACT

48. Talman incorporates by reference the allegation in paragraphs 1 through 41 of the Complaint as fully set forth herein.

49. The Defend Trade Secrets Act, 18 U.S.C. § 1831, *et seq*. ("DTSA"), defines a "trade secret" to include all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, programs, formulas, designs, prototypes, methods, techniques, processes, procedures, programs or codes,

11

whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if: (1) the owner thereof has taken reasonable measures to keep such information secret; and (2) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. *See* 18 U.S.C. §§ 1831, 1836, 1839.

50. Talman's Protected Information provides competitive advantages and derives independent economic value from not being generally known to, or readily ascertainable through proper means, by another person who can obtain economic value from the disclosure or use of the information.

51. All of Talman's Protected Information is the result of years of hard work and a substantial expenditure of time, effort, and expense, and constitutes "trade secrets" within the meaning of applicable law, including but not limited to, the DTSA. 18 U.S.C. § 1839(3).

52. Talman has taken reasonable measures to keep its Protected Information secret.

53. Urevig and Hacker acquired and used Talman's Protected Information through improper means and without authorization.

54. Urevig and Hacker misappropriated Talman's Protected Information by pirating the information and using it to unfairly compete and poach Talman's customers in violation of the DTSA.

55. Urevig is actively soliciting Talman's clients using Talman's Protected Information to solicit Talman's clients and unlawfully compete with Talman.

56. The trade secret information that Defendants have misappropriated relates to services that Talman provides to customers throughout the country.

57. If the continued misappropriation of Talman's Protected Information by Urevig and Hacker is not enjoined, it could destroy Talman's competitive advantage.

58. As a direct and proximate result of Defendants' misappropriation of Talman's Protected Information, and Defendants' inevitable disclosure, use, and reliance on Talman's Protected Information, Talman has been harmed and damaged.

## COUNT III
### MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE ILLINOIS UNIFORM TRADE SECRETS ACT

59. Talman incorporates by reference the allegation in paragraphs 1 through 41 of the Complaint as fully set forth herein.

60. The Illinois Trade Secrets Act, 765 ILCS 1065/, *et seq*. ("ITSA"), defines a "trade secret" as "information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

61. Talman's Protected Information provides competitive advantages and derives independent economic value from not being generally known to other persons who can obtain economic value from its disclosure or use.

62. Talman's Protected Information is the result of years of work and substantial expenditure of time, effort, and expense, and constitutes "trade secrets" within the meaning of applicable law, including but not limited to, the ITSA. 765 ILCS 1065/2(d)(1)-(2).

63. Talman has taken reasonable measures to keep its Protected Information secret.

64. Urevig and Hacker acquired and used Talman's Protected Information through improper means and without authorization.

65. Urevig and Hacker misappropriated Talman's Protected Information by pirating the information and using it to unfairly compete and poach Talman's customers in violation of the ITSA.

66. Urevig is actively soliciting Talman's customers and using Talman's Protected Information to solicit Talman's client and unfairly compete with Talman.

67. If the continued misappropriation of Talman's Protected Information by Urevig and Hacker is not enjoined, it could destroy Talman's competitive advantage.

68. As a direct and proximate result of Defendants' misappropriation of Talman's Protected Information, and Defendants' inevitable disclosure, use, and reliance on Talman's Protected Information, Talman has been harmed and damaged.

## COUNT IV
## COMMON LAW UNFAIR COMPETITION

69. Talman incorporates by reference the allegation in paragraphs 1 through 40 of the Complaint as fully set forth herein.

70. Defendants are engaged in unfair competition and illegal conduct by their use and disclosure of Talman's Protected Information; their solicitation of Talman's customers and prospective clients, and their deliberate undercutting of Talman's pricing.

71. As a direct and proximate result of Defendants' unfair competition, Plaintiff has been damaged in an amount to be proven at trial.

## COUNT V
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGES

72. Talman incorporates by reference the allegation in paragraphs 1 through 41 of the Complaint as fully set forth herein.

73. Talman has a reasonable expectancy of continuing to do business with PirTano and its other longstanding customers.

74. Defendants are aware of Talman's expectancy of continuing to do business with PirTano and its other longstanding customers.

75. Defendants have intentionally and unjustifiably interfered with Talman's legitimate expectations of continued permit acquisition services from PirTano and its other customers and Defendants have interfered with Talman's expectancies.

76. Defendants acted willfully, maliciously and without justification.

77. Due to Defendants' interference, Defendants' actions have damaged Talman in an amount to be determined at trial.

**WHEREFORE**, Talman requests that this Court enter judgment in Talman's favor and order against Defendants Alexandra Urevig and Hacker Consulting Group, the following relief:

A. Temporarily, preliminarily and permanently enjoin Defendants from using or disclosing any of Talman's confidential, proprietary and/or trade secret information;

B. Temporarily, preliminarily and permanently enjoin Defendants from engaging in or participating in any activity designed to solicit or divert any entity that was a customer of Talman or known to Urevig as a prospective customer of Talman during Urevig's employment at Talman;

C. Order Defendants to return to Talman all originals and copies of all files, devices or documents that contain or relate to Talman's confidential, proprietary or trade secret information;

D. Order Defendants to preserve all documents, data, and electronic information and to provide for inspection and imaging of all computers and other electronic storage devices and email accounts belonging to, under the control of, accessible to or operated by Defendants;

  E. Awarding Talman actual, incidental, compensatory, and consequential damages to be proven at trial;

  F. Awarding Talman exemplary or punitive damages in an amount to be proven at trial due to Defendants' willful and malicious activities;

  G. Ordering an accounting and disgorging of all monies received and/or paid to the Defendants as a result of Defendants' unfair competition and tortious conduct;

  H. Awarding Talman its reasonable attorney's fees, expenses, and costs incurred in this action; and

  I. Awarding Talman such further relief as the Court deems necessary and just.

## DEMAND FOR A JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Talman demands trial by jury in this action on all issue triable by jury.

              Respectfully submitted,

              TALMAN CONSULTANTS, LLC

              By: */s/ Kerry E. Saltzman*
                One of Its Attorneys

              Kerry E. Saltzman (ARDC # 6191194)
              Saltzman@wbs-law.com
              Patrick M. Spellman (ARDC # 6327634)
              Spellman@wbs-law.com
              Williams, Bax & Saltzman, P.C.
              221 N. LaSalle St. – Suite 3700
              Chicago, IL 60601
              (312) 372-3311

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TALMAN CONSULTANTS, LLC, an Illinois Limited Liability Corporation, | ) ) ) | |
| Plaintiff, | ) ) ) | Civil Action No. |
| v. | ) ) | |
| ALEXANDRA UREVIG, individually and HACKER CONSULTING GROUP, LLC, an Illinois Limited Liability Corporation, | ) ) ) ) ) | JURY DEMANDED |
| Defendants. | ) ) | |

## VERIFICATION

I, Katherine Latham, declare as follows:

1. My name is Katherine Latham. I am over the age of twenty-one (21) and am fully competent to make this verification.

2. I am the Managing Partner of Plaintiff, Talman Consultants, LLC ("Talman").

3. As Managing Partner of Talman, I have personal knowledge of the allegations set forth in Talman's Verified Complaint, and if called upon to testify I would competently testify as to the matters stated therein.

4. I verify under penalty of perjury under the laws of the United States of America that the statements set forth in Talman's Verified Complaint are true and correct, except as to matters therein stated to be on information and belief.

_____
Katherine Latham

Executed on November 21, 2022