IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TALMAN CONSULTANTS, LLC, an Illinois Limited Liability Corporation, <br><br> Plaintiff, <br><br> v. <br><br> ALEXANDRA UREVIG, individually and HACKER CONSULTING GROUP, LLC, an Illinois Limited Liability Corporation, <br><br> Defendants. | No. 22 C 6540 <br><br> Judge Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

Talman Consultants, LLC, an engineering consulting firm, hired Alexandra Urevig to be a permit coordinator. In that role, Urevig learned the permitting process from Talman's two founders and worked with internal manuals not available to the public. Last year, Urevig told Talman she intended to leave the company because she found the profession too stressful. Around the same time though, she forwarded Talman's internal manuals to her personal email, then established her own consulting group, Hacker Consulting Group, LLC, and began contacting Talman's clients. After losing business, Talman sued, asserting Urevig violated her contract's non-solicitation and confidentiality clauses, stole trade secrets, engaged in unfair competition, and intentionally interfered with prospective economic advantages. (Dkt. 1). Urevig moves to the dismiss for failure to state a claim. (Dkt. 15). For the following reasons, the motion is denied in part and granted in part. (*Id.*)

## BACKGROUND

Talman is an engineering consulting firm that assists general contracts complete public-works projects in infrastructure, telecommunication, and utilities markets. (Dkt. ¶ 2). The firm

1

provides a variety of consulting services. (*Id.*) "An essential ingredient of Talman's consulting services is its ability to expedite the permitting." (*Id.* ¶ 19). Talman's owners, Katherine Latham and James Norton, used "their combined knowledge and years of experience to develop a new, systematic approach to the permit acquisition process." (*Id.* ¶ 20). The process was detailed in two internal manuals, one for Chicago and Cook County and one for the Chicago suburbs and surrounding counties. (*Id.* ¶ 25).

In 2018, Talman hired Urevig as a permit coordinator without any prior experience in permitting or any the relevant work projects. (*Id.* ¶¶ 22–23). Urevig learned Talman's permit-acquisition process under Latham and Norton, as well as the firm's pricing formulas. (*Id.* ¶¶ 23, 28). And the company owners, in turn, introduced Urevig to local customers, who had been doing business with Talman for several years. (*Id.* ¶ 24).

Upon her hiring, Urevig signed an Employment Agreement with a non-solicitation clause and a confidentiality provision. The primary non-solicitation clause reads,

> Employee agrees that, during the period beginning on the execution of this Agreement and ending twelve (12) months following Employee's voluntary or involuntary termination of employment, Employee shall not in any capacity, whether directly or indirectly, and regarding any location in the United States of America:
>
> Call on, solicit, service (or own, manage, operate or control, or be connected as an officer, director, employee, consultant, advisor, agent, independent contractor, representative, partner, member, of or with any person that calls on, solicits, or services) any individual, entity, or successor to any individual or entity which is or was a client or customer of Employer's at any time during the time Employee was engaged to perform any work for Employer, or who Employee had knowledge of prior to termination of employment was a prospective client of Employer.

(*Id.* ¶ 29; *see also* Dkt. 1-1 § 5(b)).[1] And the confidentiality provision stipulates,

> Employee will (and will cause each person and entity under his or her direct or indirect control (his or her "Affiliates") and his or her representatives to) treat and

---

[1] Section 5(d) has a similar non-solicitation clause, except the period is twenty-four months. (Dkt. 1-1 § 5(d)).

> hold as confidential all of the Confidential Information (as that term is defined herein).
>
> Confidential information means information, whether oral, written, recorded, magnetically or electronically or otherwise stored and whether originated by Employee or otherwise coming into the possession or knowledge of Employee, which is possessed by or developed for the Employer and which relates to the Business of the Employer or potential Business of the Employer, which information is not reasonably ascertainable by the Employer's competitors or by the general public through lawful means, including but not limited to information regarding the Employer's products services, customer contracts, pricing formulae, vendors, suppliers, specifications, designs, processes, business affairs, business plans, strategies, finances, computer programs, research, customer development, planning, production plans, purchasing, finance, marketing, customer relations and customer information and other information received by the Employer from others which the Employer has an obligation to treat as confidential.

(Dkt. 1 ¶ 30; *see also* Dkt. 1-1 § 5(c)).

In May 2022, Urevig forwarded herself the manuals, customer lists, and sample permits for the City of Chicago. (*Id.* ¶ 34). She then set up her company Hacker Consulting Group, LLC, and resigned from Talman because "the competitive and demanding nature of the business 'was too much for her.'" (*Id.* ¶¶ 35–36). Urevig assured the firm's human resources manager she would never work for another company, that she appreciated her treatment, and that she wanted to work in the healthcare industry. (*Id.* ¶ 36). Two months later, Urevig began contacting Talman's customers, beginning with Craig Shiffman of MasTec Network Solutions. (*Id.* ¶ 38). She emailed him to advise that she began her "own permitting firm specializing in permit acquisition throughout Chicago and the surrounding municipalities." (*Id.*) Shortly after, she contacted Kevin Wilhelm of Melcomm Services to let him know she had "gone out on my own for permitting services." (*Id.* ¶ 39). Included in the contact email were quoted prices just below what Talman had been charging. (*Id.*)

After investigating the loss of customers, Talman sued Urevig and Hacker Consulting Group for breach of contract (Count 1); misappropriation of trade secrets under the federal

3

Defendant Trade Secrets Act and the Illinois Uniform Trade Secrets Act (Counts II & III); unfair competition (Count IV); and tortious interference with prospective economic advantages (Count V). (*See generally id.*). Talman also filed a motion for a temporary restraining order, requesting the Court to enjoin any use of confidential information or further solicitation of customers. (Dkt. 5). Urevig filed a motion to dismiss for failure to state a claim. (Dkt. 15). This Court held oral argument on the temporary restraining order on December 13, 2022, and denied the motion—without addressing the merits—because Talman did not establish "irreparable harm," a "threshold requirement" for equitable relief. (Dkt. 18 (quoting *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 535 (7th Cir. 2021) (cleaned up))). The Court turns now to the motion to dismiss. (Dkt. 15).[2]

## LEGAL STANDARD

Under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face" to survive a motion to dismiss. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (cleaned up). When considering a motion to dismiss, courts "accept the allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co.*, 20 F.4th 303, 307 (7th Cir. 2021) (cleaned up). But "allegations in the form of legal conclusions are insufficient" to survive a motion to dismiss, as are "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Def. Sec. Co. v. First Mercury Ins. Co.*, 803

---

[2] Urevig makes the odd argument that the complaint "fails to plead separate causes of action against Defendants Urevig and Hacker." (Dkt. 16 at 12). But the document clearly lays out the necessary facts and theories of recovery. Urevig set up Hacker, and she controls the company. Talman wishes to collect against both defendants. All the counts apply against both parties except Count I, by Talman's own admission. (Dkt. 23 at 11).

4

F.3d 327, 334 (7th Cir. 2015) (quoting *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014)).

## DISCUSSION

### I. Breach of Contract (Count I)

Parties must abide by the terms of a contract. *See In re Illinois Bell Telephone Link-Up II*, 994 N.E.2d 553, 558 (Ill. App. Ct. 2013). Talman maintains that Urevig broke her agreement to not solicit customers for one year and not use confidential information learned through her employment. Urevig believes both provisions are unenforceable.

#### A. Non-solicitation Clause

Under Illinois law, the terms of a restrictive covenant, such as a non-solicitation clause, must be reasonable. *Cambridge Engineering, Inc. v. Mercury Partners 90 BI, Inc.*, 879 N.E.2d 512, 522 (Ill. App. Ct. 2007). "[A] restrictive covenant is reasonable only if the covenant (1) is no greater than is required for the protection of a legitimate business interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public."[3] *McInnis v. OAG Motorcycle Ventures, Inc.*, 35 N.E.3d 1076, 1081–82 (Ill. App. Ct. 2015). As the Illinois Appellate Court explained,

> whether a legitimate business interest exists is based on the totality of the facts and circumstances of the individual case. Factors to be considered in this analysis include, but are not limited to, the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions. No factor carries any more weight than any other, but rather its importance will depend on the specific facts and circumstances of the individual case.

---

[3] There are two preconditions to assessing reasonableness: "First, the court must find that the covenant is ancillary to either a valid transaction or a valid relationship; second, the court must determine whether there is adequate consideration to support the covenant." *Prairie Rheumatology Assocs., S.C. v. Francis*, 24 N.E.3d 58, 62 (Ill. App. Ct. 2014). Urevig does not dispute these conditions have been met, and so no additional analysis is needed.

*Reliable Fire Equipment Co. v. Arredondo*, 965 N.E.2d 393, 403 (Ill. App. Ct. 2011). Urevig eschews this legal framework and focuses her argument on two factors from *Reliable Fire* related to Talman's legitimate business interests. She asserts first the definition of "client" is too broad, and second (though the argument is murky), the clause's geographical provision stretches to unconnected parts of the country. (Dkt. 16 at 4–6). Neither point prevails.

Talman's non-solicitation clause reasonably protects its legitimate business interests. The restricted list is reasonable and narrowly crafted—even if the language could better reflect this tailoring. Urevig could not solicit people from an entity "which is or was a client or customer of Employer's at any time during the time Employee was engaged to perform any work for Employer, or who Employee had knowledge of prior to termination of employment was a prospective client." (Dkt. 1-1 § 5(b)(i)). In short, the agreement covers only clients and former clients along with prospective clients with the important caveat that Urevig *knew* at termination they were prospective. Urevig was free to solicit any number of non-clients, not only in Illinois but elsewhere throughout the country. At this phase of litigation, the number of clients versus non-clients is unknown, so it may be that with additional fact-finding, that burden proves too onerous. But for now, the latter part of the clause is not so unreasonable as to undermine the entire cause of action.

Likewise, the geographical-restriction clause, which extends to any past, current, or known future client in the United States, is permissible. Illinois courts have repeatedly allowed restrictive covenants that have no geographical boundaries when qualified by an activity restraint, which, unlike a general non-solicitation or noncompete covenant, limits the employee by the type of activity rather than "all competition within a particular geographical area." *Howard Johnson & Co. v. Feinstein*, 609 N.E.2d 930, 935 (Ill. App. Ct. 1993); *see also Dryvit System, Inc. v. Rushing*, 477 N.E.2d 35, 38 (Ill. App. Ct. 1985) (rejecting the proposition that "a broad geographical

6

application [] automatically invalidate[s] a post-employment restraint"). Moreover, "[a]ctivity restraints as well as restrictive covenants concerning confidential information and trade secrets are subject to a less stringent test of reasonableness than that which is applied to restrictions with a geographical limitation." *Dryvit System*, 477 N.E.2d at 39. *Wolf & Company v. Waldron* blessed a restriction without a geographical limitation, in part, because it prohibited the employee only from contacting former clients. 366 N.E.2d 603, 605 (Ill. App. Ct. 1977). *Donald McElroy Inc v. Delaney* involved a three-year limitation with the qualification that the employee could not contact certain customers with confidential information. 389 N.E.2d 1300, 1307–08 (Ill. App. Ct. 1979). And *Tower Oil & Technology Co. Inc. v. Buckley*—that proves almost dispositive here—specifically allowed a non-solicitation clause because it "did not threaten any legitimate interests of the public" nor cause undue hardship on the employee. 425 N.E.2d 1060, 1065 (Ill. App. Ct. 1981).

Here, Talman placed a limited activity restraint on Urevig for only one year. While the language appears broad because the phrase includes "in the United States," the actual effect was minor. (Dkt. 1-1 § 5(b)). The geographical limitation related to the clients, not Urevig herself. She may not have been able to solicit certain clients, but she could open her business in Cook County or the surrounding counties, bring in as many non-Talman clients as she desired, continue to learn the permitting process, and even do work for Talman clients that contacted her. *See Tower Oil*, 425 N.E.2d at 1065; *Dryvit System*, 477 N.E.2d at 39. Then, after just one year, she could solicit any client, anywhere.

### B. Confidentiality Clause

Confidentiality clauses, like non-solicitation clauses, are also restrictive covenants and so must be reasonable, but the standard for reasonableness is more forgiving. *Coady v. Harpo, Inc.*,

7

719 N.E.2d 244, 250 (Ill. App. Ct. 1999).[4] For example, noncompete agreements must generally include time and geographical limitations, but "a confidentiality agreement will not be deemed unenforceable for lack of durational or geographic limitations where trade secrets and confidential information are involved," the logic being covenants not to compete rob an employee of the ability to work, whereas confidentiality agreements only require employees to not divulge certain information. *Id.* That does not, however, mean anything goes. For example, using information "generally available to employees, known by persons in the trade, or easily found in telephone directories and industry directories" cannot be restricted. *The Agency, Inc. v. Grove*, 839 N.E.2d 606, 615 (Ill. App. Ct. 2005) (quoting *Appelbaum v. Appelbaum*, 823 N.E.2d 1074, 1082 (Ill. App. Ct. 2005)).

    The confidentiality clause in Urevig's contract is facially reasonable. Employers can protect confidential information, and the clause does just that. *Coady*, 719 N.E.2d at 250. It provides that each employee must "treat and hold as confidential all of the confidential information" defined by the contract as business "information [that] is not reasonably ascertainable by the Employer's competitors or by the general public through lawful means." (Dkt. 1-1 § 5(c)(iii)). Urevig objects because the possible information includes a long list with examples such as "pricing" and "marketing." But any provided example is qualified by the phrase "reasonably ascertainable by the Employer's competitors or by the general public," so Urevig remains free to argue that she abided by the contract because the information she used was covered by either safety valve. Talman must still prove that Urevig violated the clause instead of simply using publicly available information.

---

[4] *North American Paper Co. v. Unterbeger*, 526 N.E.2d 621 (Ill. App. Ct. 1988), is not relevant because the Court focused on the noncompetition provision, which covered a third of the country. *See Baird & Warner Residential Sales, Inc. v. Mazzone*, 893 N.E.2d 1010, 1015 (Ill. App. Ct. 2008).

8

## II.    Trade Secrets (Counts II & III)

Talman brings trade-secrets claims under both the Defend Trade Secrets Act and the Illinois Uniform Trade Secrets Act. (Dkt. 1 ¶¶ 48–68). The parties treat these laws as identical, with the same pleading requirements to survive a motion to dismiss. (*See generally* Dkt. 16, 23, 25).

There are three elements for a trade-secret misappropriation: (1) a trade secret existed; (2) the secret was misappropriated; and (3) the owner was injured. *J.S.T. Corporation v. Foxconn Interconnect Technology Ltd.*, 965 F.3d 571, 577 (7th Cir. 2020). Information qualifies as a trade secret when "the owner thereof has taken reasonable measures to keep such information secret" and "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3); *see also Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 540 (7th Cir. 2021) ("Illinois's definition is materially identical"). Whether a plaintiff has established a "trade secret" is generally a question of law that requires a holistic analysis, *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003), though certain rules limit the inquiry, *Life Spine, Inc.*, 8 F.4th at 540. *See also, e.g.*, *BondPro Corp. v. Siemens Power Generation, Inc.*, 463 F.3d 702, 706 (7th Cir. 2006) (publishing a patent "destroys the trade secret"). As relevant here, information gathered from a government agency, widely available to the public, is not a trade secret because any individual could access the same underlying documents. *Cf. American Can Co. v. Mansukhani*, 742 F.2d 314, 326 (7th Cir. 1984) ("[I]t is [] clear that [a defendant cannot] be enjoined from using public information.").

9

Talman's permitting process laid out in two internal manuals—as alleged in the complaint and at this preliminary stage in litigation—meets the criteria for a "trade secret." Talman certainly tried the keep the information confidential. They make employees, such as Urevig, sign confidentiality agreements, and the information is kept private within the company. More critically, the permitting process gains value by providing "competitive advantages and [] independent economic value from not being generally known to, or readily ascertainable through proper means, by another person." (Dkt. 1 ¶ 50). It is true that governments readily publicize permit acquisition information. Any citizen could theoretically attempt the process. What makes Talman special, though, is its ability to streamline the process using "years" of experience and acquired knowledge, gained by expending "time, effort, and expense." (*Id.* ¶ 51). The Court needs little convincing that companies would plausibly pay to avoid a Kafka-esque morass and that it would take a consulting firm years to distill down an effective guide to navigating municipal permitting. The complaint may be sparser than Urevig would prefer—but pleading requirement do not demand that companies divulge the fine details of trade secrets. *See Invado Pharms., Inc. v. Forward Sci. Distribution LLC*, No. 18 C 2515, 2018 WL 5013556, at *3 (N.D. Ill. Oct. 16, 2018). That would defeat the purpose of the laws protecting trade secrets.

Finally, in perhaps the most telling sign that the permitting manuals have value, Urevig herself forwarded them to her personal email account right before leaving Talman and starting her own company. (*Id.* ¶ 34). Why do so if the information is easily accessible online? Only she knows. The inference from that act, coupled with the rest of the factual allegations, ensure the two counts state claims for relief.

### III. Tortious Interference with Prospective Economic Advantages (Count V)

"To plead a sufficient cause of action for tortious interference with prospective economic advantage, a plaintiff must allege that (1) he had a reasonable expectancy of a valid business relationship; (2) the defendant knew about the expectancy; (3) the defendant intentionally interfered with the expectancy and prevented it from ripening into a valid business relationship; and (4) the intentional interference injured the plaintiff." *Boffa Surgical Group LLC v. Managed Healthcare Assocs. Ltd.*, 47 N.E.3d 569, 577 (Ill. App. Ct. 2015). The existence of this tort is not meant to stifle healthy competition in competing for business relationships. To that end, "a plaintiff must show not merely that the defendant has succeeded in ending the relationship or interfering with the expectancy, but purposeful interference—that the defendant has committed some *impropriety* in doing so." *Kapotas v. Better Government Ass'n*, 30 N.E.3d 572, 596 (Ill. App. Ct. 2005) (quoting *Dowd & Dowd, Ltd. v. Gleason*, 693 N.E.2d 358, 371 (Ill. 1998)) (cleaned up) (emphasis added). "Purposeful interference" requires "facts which suggest that [the] defendant acted with the *purpose of injuring* plaintiff's expectancies." *J. Eck & Sons, Inc. v. Reuben H. Donnelley Corp.*, 572 N.E.2d 1090, 1093 (Ill. App. Ct. 1991) (emphasis added).

Together, "impropriety" and "purpose of injuring" set the bar high—a bar that Talman has not overcome. The company identified only one business opportunity: the "continued permit acquisition services from PirTano and its other customers." (Dkt. 1 ¶ 74). But the complaint does not explain how Urevig committed some impropriety. *See Kapotas*, 30 N.E.3d at 596. Putting aside her potential breach of contract and trade-secret violations, she competed normally, and tort law does not penalize a business for acting to further its own interests. While Talman alleges willful and malicious acts, (Dkt. 1 ¶ 75), this allegation is legal and, thus, insufficient without supporting facts.

### IV. Unfair Competition (Count IV)

Unfair competition is an equitable doctrine and, as such, proves "elusive," confusing, and difficult—if not impossible—to define with clear elements. *Wilson v. Electro Marine Systems, Inc.*, 915 F.2d 1110, 1118 (7th Cir. 1990). There is a "broad spectrum of law that is called unfair competition," but courts struggle to articulate what plaintiffs need to allege (or prove) to succeed in their claims.[5] *Duo-Tint Bulb & Battery Co., Inc. v. Moline Supply Co.*, 360 N.E.2d 798, 801 (Ill. App. Ct. 1977). Here though, the Court need not define those boundaries. Under any definition, Talman has not sufficiently alleged unfair competition. The company produced no caselaw. The sole response is an assertion that Urevig's argument fails "because discovery has not yet taken place." (Dkt. 23 at 10). This statement is bald and unilluminating, and the company's grievances associated with "unfair competition" have clear legal causes of action, as stated above.

### CONCLUSION

For these reasons, the defendants' motion to dismiss is denied in part (Counts I – III) and granted in part with leave to file an amended complaint no later than February 22, 2023 (Count IV & V). (Dkt. 15). Plaintiff is granted leave to file under seal its exhibits for either the original complaint or an amended complaint.

_____
Virginia M. Kendall
United States District Judge

Date: February 1, 2023

---

[5] The confusion likely lies with the fact that competition is typically encouraged, and no doubt, before developments in torts, contracts, consumer-protection law, and other statutory provisions, a judicial doctrine of unfair competition gap-filled legal deficiencies.